## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**ALYSSON MILLS,** *in her capacity as*                                    **PLAINTIFF**
*receiver for Arthur Lamar Adams and*
*Madison Timber Properties, LLC*

**V.**                                                  **CAUSE NO. 3:20-CV-232-CWR-FKB**

**JON DARRELL SEAWRIGHT**                                          **DEFENDANT**

## ORDER

Before the Court is Jon Darrell Seawright's motion to dismiss. Docket No. 7. The matter is fully briefed and ready for adjudication. On review, the motion will be denied.

### I.     Factual and Procedural History

From at least 2010 until April 2018, Lamar Adams operated timber investment companies called Madison Timber Company LLC and Madison Timber Properties LLC. He told investors they were purchasing shares of timber tracts that would be harvested and sold to lumber mills at a significant profit. The demand for lumber was so great, he said, he could guarantee investors a fixed rate of return in excess of 10%. Investors believed him. They collectively gave him hundreds of millions of dollars.

Adams was lying. He had, with the help of others, faked everything about the scheme. There were no timber deeds, tracts of land, or lumber mills. He was actually using new investors' money to pay old investors—a classic Ponzi scheme. It worked only as long as Adams and his associates could continue to bring in new money.

The scheme collapsed in April 2018. Adams turned himself in to the United States Attorney's Office in Jackson, Mississippi and quickly pleaded guilty to wire fraud. He is now

serving a 19.5-year sentence in federal prison. The sentence reflects the significance of the fraud; the criminal proceeding established that Adams' victims lost approximately $85 million.

When the Ponzi scheme collapsed, the U.S. Securities and Exchange Commission asked this Court to appoint a receiver to take charge of Adams' companies and provide some measure of financial relief to his victims. The Court appointed Alysson Mills to be that receiver.

Mills has a duty to "identif[y] and pursue[] persons and entities as participants in the Ponzi scheme to recover funds for distribution to investor-claimants." *Zacarias v. Stanford Int'l Bank, Ltd.*, 945 F.3d 883, 891 (5th Cir. 2019). To date, she has sold Adams' assets, negotiated settlements with Adams' enablers, and filed lawsuits against persons and entities that contributed to the fraud.

This is an offshoot of one of those lawsuits.

In another civil action pending in this Court, Cause No. 3:18-CV-866, the receiver alleges that Jon Darrell Seawright and other conspirators knowingly facilitated Adams' fraud. She seeks to hold them accountable for the receivership estate's outstanding liabilities.

Seawright subsequently filed for bankruptcy, seeking to avoid any debt to the receivership estate. The receiver filed an adversary complaint to determine dischargeability of debt. The receiver then moved to withdraw the reference, an act which resulted in the case drawing this Civil Action number. That motion was granted as unopposed.

In this Civil Action number, therefore, the receiver seeks a declaration that Seawright cannot avoid his liabilities to the receivership estate through bankruptcy.

The Court now turns to the allegations in the adversary complaint.

Seawright, an attorney, works for the Baker Donelson law firm in Jackson, Mississippi. He is a shareholder of the firm who specializes in corporate mergers and acquisitions.

2

This dispute arises out of Seawright's side hustle—his operation of Alexander Seawright LLC and various Alexander Seawright "Timber Funds" with a Baker Donelson colleague named Brent Alexander. The adversary complaint describes Alexander, Seawright, and their LLCs as active, critical enablers of the Madison Timber Ponzi scheme.

Here's how it worked. Seawright and his colleague recruited Baker Donelson clients and other individuals with assets to invest in their LLCs, which in turn invested in Madison Timber. Seawright told investors that he and Alexander "would be responsible for papering everything, liaison with Lamar, monitoring process of sale of timber, acquisition of timber rights, proper recording of documents, etc., distribution of loan repayments and otherwise managing the investment." Seawright also told them that he and Alexander had their own money invested in the fund. The investors believed him, thinking that the due diligence, the skin in the game, and the guaranteed return—13%—were real. They were not.

The pitch was nevertheless successful. Seawright and Alexander brought millions of dollars into the fund, propping up the Ponzi scheme. They took 3% off of the investors' 13% "return" and separately got another 3% commission from Adams. The result was a timber investment with a guaranteed 16% return *before* Adams took his profit. Acknowledging their value, Adams gave them extra money in the form of Christmas bonuses in cash. Seawright allegedly acted as a commissioned yet unlicensed broker of securities, which is a violation of state and federal law.

The scheme looked more secure than it was because Seawright and Alexander were at Baker Donelson—one of the region's largest law firms. At the time, Seawright was not only a shareholder representing the firm's clients in complex business transactions, mergers and acquisitions, and taxation, but was a member of the firm's Board of Directors. Alexander, a

3

lobbyist, provided strategic business consultation to the firm's clients. Alexander and Seawright's investment pitchbook proudly marketed their employment and leadership within the firm, and promised clients that it was "not a problem" to move money through Baker Donelson's escrow account. The receiver alleges that they further exploited their association with the firm by targeting clients who had recently closed transactions with Baker Donelson. They would invite potential investors to the firm to make presentations and pitches to encourage them to give them their money to invest in the timber scheme.

The heart of the adversary complaint describes a pattern of lies. Seawright accepted without question or investigation Adams' lies about "insurance" on the timber tracts, and the various "deeds" and contracts evincing the timber scheme. Seawright then lied to investors when he told them that he would personally inspect the documents and timber investment property. Seawright and his colleague inspected a timber tract only once or twice, the receiver says, adding that according to an email, "inspection" meant get "a cooler of beer and make a loop." Seawright now claims that he undertook "meaningful evaluations of the loans."

Had Seawright called a single timber tract owner or lumber mill, the whole scheme would have unraveled. Had Seawright taken heed of the warnings other investment professionals told him in writing—that Adams' business model was "foreign" in the timber industry—the charade would have collapsed. Yet Seawright and his colleague pressed on, increasing their investment and furthering the Ponzi scheme's expansive growth.

The receiver's earlier-filed action sued Seawright, Alexander, and other parties for civil conspiracy, aiding and abetting, negligence, and other claims. In this bankruptcy-related action, the receiver claims that the debts Seawright owes to the receivership estate should not be discharged for the following reasons: (1) because they were obtained by false pretenses, a false

4

representation, or fraud; (2) for fraud or defalcation while acting in a fiduciary capacity; and (3) for willful and malicious injury to another's property.

After withdrawal of the reference, the present motion followed.

## II.   Legal Standard

When considering a motion to dismiss under Rule 12(b)(6), the Court accepts the plaintiff's factual allegations as true and makes reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To proceed, the complaint "must contain a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* at 677-78 (quotation marks and citation omitted). This requires "more than an unadorned, the defendant-unlawfully-harmed-me accusation," but the complaint need not have "detailed factual allegations." *Id.* at 678 (quotation marks and citation omitted). The plaintiff's claims must also be plausible on their face, which means there is "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted).

## III.   Discussion

### A.   Standing

Seawright first claims that the receiver lacks standing.

The Constitution limits the jurisdiction of federal courts to actual cases and controversies. U.S. Const. art. III, § 2. Parties seeking to invoke federal-court jurisdiction must therefore demonstrate standing, which is shown by three elements: (1) an injury in fact that is concrete and particularized as well as imminent or actual; (2) a causal connection between the injury and the defendant's conduct; and (3) that a favorable decision is likely to redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). In a standing analysis, the court "must

accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501-02 (1975).

Seawright's standing arguments are unpersuasive in light of the Fifth Circuit's decision in *Zacarias v. Stanford International Bank*. There, the appellate court upheld a federal equity receiver's standing to sue professionals who conspired with Allen Stanford to carry out a Ponzi scheme. The court found "no dispute" that the receiver had standing to bring such claims. 945 F.3d at 899. It reasoned as follows:

> They bring only the claims of the Stanford entities—not of their investors—alleging injury to the Stanford entities, including the unsustainable liabilities inflicted by the Ponzi scheme. The receiver and Investors' Committee "allege that Defendants' participation in a fraudulent marketing scheme increased the sale of Stanford's CDs, ultimately resulting in greater liability for the Receivership Estate," and that defendants "harmed the Stanford Entities' ability to repay their investors." The receiver and Investors' Committee sought to recover for the Stanford entities' Ponzi-scheme harms, monies the receiver will distribute to investor-claimants. The district court had subject matter jurisdiction over these claims.

*Id.*

We are presented with the same essential structure here. The receiver has sued a lawyer acting as an investment advisor that, she alleges, conspired with the Ponzi scheme principal to further the Ponzi scheme and cause greater liabilities to the receivership estate. *See id.* at 901. She seeks to recover for injuries to the Madison Timber entities' "unsustainable liabilities inflicted by the Ponzi scheme," and distribute that money to investor-claimants. *Id.* at 899. As in *Zacarias*, there can be "no dispute" that she has standing.

Seawright then argues that the receiver lacks standing because she is not a "creditor" and has no underlying "claim."

"A creditor is an entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor. A claim is defined as a right to payment,

whether or not such right is reduced to judgment." *In re Davis*, 194 F.3d 570, 574 (5th Cir. 1999) (quoting 11 U.S.C. § 101(10)(A) and (5)(A)). In *Davis*, the Fifth Circuit found that an administratrix of an estate was a creditor with standing to bring a nondischargeability action. *Id.*

It is plain that the receiver is a creditor with standing. She has a claim against Seawright for damages to the receivership estate that arose before these proceedings. That her claim has not yet been reduced to judgment is irrelevant under controlling law. *See id.* She may proceed with this nondischargeability action.[1]

### B.      Nondischargeability

> The issue of nondischargeability is a matter of federal law governed by the terms of the Bankruptcy Code. Nondischargeability must be established by a preponderance of the evidence. Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start. However, the Bankruptcy Code limits the opportunity for a new beginning to the honest but unfortunate debtor.

*Matter of Cowin*, 864 F.3d 344, 349 (5th Cir. 2017) (quotation marks, citations, and brackets omitted).

The receiver's three theories of nondischargeability—theories that necessarily "overlap," *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1588 (2016)—will be addressed in turn.

### 1.      Section 523(a)(2)(A): False Pretenses, False Representation, or Fraud

"Section 523(a)(2)(A) provides that an individual debtor will not be discharged 'from any debt . . . for money . . . to the extent obtained by . . . false pretenses, a false representation, **or** actual fraud . . . .'" *Matter of Selenberg*, 856 F.3d 393, 397 (5th Cir. 2017) (quoting 11 U.S.C.

---

[1] In reply, Seawright alleges that the receiver lacks standing because she filed the underlying amended complaint in violation of the automatic stay. The undersigned must disagree. All involved have been careful to protect Seawright from having to respond or defend himself in the underlying action. This Court ordered amendment to move that case along only as to the other defendants. And to the extent this Court erred as to Seawright in seeking to move its docket as to others, the error was harmless. *See Matter of Cowin*, 864 F.3d 344, 353 (5th Cir. 2017).

§ 523(a)(2)(A)) (emphasis added). The word "or" has significance; the creditor need only prove

one of the options within § 523(a)(2)(A) to render the debt nondischargeable. *See Husky Int'l*,

136 S. Ct. at 1590.

> Each option has its own definition:

> To obtain a judgment that a debt is nondischargeable for **false pretenses**, the creditor must show that: (1) the debtor engaged in conduct wronging one in his property rights by dishonest methods or schemes such as deprivation of something of value by trick, deceit, chicanery or overreaching; (2) there was scienter or intent; (3) causation; and (4) damages.

*In re Rifai*, 604 B.R. 277, 312 (Bankr. S.D. Tex. 2019) (quotation marks, citations, and brackets

omitted) (emphasis added). "[A] claim of false pretenses may be premised on misleading

conduct without an explicit statement." *In re Minardi*, 536 B.R. 171, 187 (Bankr. E.D. Tex.

2015) (citations omitted).

"To obtain a judgment that a debt is nondischargeable for **false representations**, the

misrepresentations must have been: (1) knowing and fraudulent falsehoods, (2) describing past

or current facts, (3) that were relied upon by the other party." *Rifai*, 604 B.R. at 308 (citations

omitted) (emphasis added). The Fifth Circuit and other courts "have overwhelmingly held that a

debtor's silence regarding a material fact can constitute a false representation actionable under

section 523(a)(2)(A)." *Selenberg*, 856 F.3d at 399 (collecting cases).

"**Actual fraud**, by definition, consists of any deceit, artifice, trick or design involving

direct and active operation of the mind, used to circumvent and cheat another—something said,

done or omitted with the design of perpetrating what is known to be a cheat or deception."

*RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995) (quoting Collier's on

Bankruptcy) (emphasis added). "An intent to deceive may be inferred from reckless disregard for

the truth or falsity of a statement combined with the sheer magnitude of the resultant

misrepresentation." *Selenberg*, 856 F.3d at 400 (quotation marks and citation omitted). "The term 'actual fraud' in § 523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation." *Husky Int'l*, 136 S. Ct. at 1586.

Seawright argues that he cannot be responsible for a false representation because he did not make any false representations, he lacked the intent to deceive, and because Adams did not rely upon his misrepresentations. The argument is unpersuasive.

The adversary complaint contains ample allegations that Seawright lied about the due diligence he performed and about having invested his own money in the scheme. Those are false representations. Investors and Adams necessarily relied upon his misrepresentations, since had Seawright actually done any due diligence, the Ponzi scheme would have collapsed. And per controlling precedent, Seawright's intent to deceive can be inferred from the circumstances. *See Selenberg*, 856 F.3d at 400; *In re Smith*, 585 B.R. 359, 370 (Bankr. N.D. Miss. 2018) ("A debtor's subjective intent may be inferred by examining the totality of the circumstances because it most commonly cannot be established by direct evidence.").

The argument on this ground is further unpersuasive because Seawright need not have made a misrepresentation to qualify for nondischargeability through one of the other options of § 523(a)(2)(A). *See Husky Int'l*, 136 S. Ct. at 1586; *Selenberg*, 856 F.3d at 399. The motion to dismiss on this basis is therefore denied.

### 2.      Section 523(a)(4): Fraud or Defalcation in a Fiduciary Capacity

"Dictionary definitions of 'defalcation' are not particularly helpful." *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 271 (2013). In bankruptcy, the term means "both intentional wrongs and wrongdoing that is the result of an actor's conscious disregard (or willful blindness) of a substantial and unjustifiable risk that his conduct will turn out to violate a

fiduciary duty." *Smith*, 585 B.R. at 372 (quotation marks and citation omitted). Unlike fraud, the term "may be used to refer to *nonfraudulent* breaches of fiduciary duty." *Bullock*, 569 U.S. at 275 (citation omitted).

"Determining whether a debtor committed fraud or defalcation while acting in a fiduciary capacity is a two-step process. First, it must be shown that the requisite fiduciary relationship existed prior to the particular transaction from which the debt arose. Second, some type of fraud or defalcation must have occurred during the fiduciary relationship." *Smith*, 585 B.R. at 371 (quotation marks and citations omitted). "[S]tate law may create a fiduciary relationship whose breach leads to nondischargeability under § 523(a)(4)." *In re Shcolnik*, 670 F.3d 624, 628 (5th Cir. 2012) (citation omitted).

Seawright contends that he cannot be held responsible under this sub-section because he was not in a fiduciary relationship with Adams or Madison Timber. The adversary complaint, however, alleges that Seawright formed a joint venture with Adams, which means Seawright owed Adams a fiduciary duty under state law. The underlying complaint also alleges that Seawright was a co-conspirator with Adams to defraud the Ponzi scheme's participants. That matters because in this circuit, the "intent and actions of . . . co-conspirators is sufficient to support nondischargeability under § 523(a)(4)." *Cowin*, 864 F.3d at 350.

The motion to dismiss this basis for nondischargeability is denied.

### 3.      Section 523(a)(6): Willful and Malicious Injury to Another's Property

Section 523(a)(6) of the Bankruptcy Code provides that a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" is not dischargeable. 11 U.S.C. § 523(a)(6). The section requires "a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).

Accordingly, "for a debt to be nondischargeable" under this section, "a debtor must have acted with objective substantial certainty or subjective motive to inflict injury." *In re Williams*, 337 F.3d 504, 508–09 (5th Cir. 2003) (quotation marks and citation omitted).

Seawright argues that the section is inapplicable because he never intended to injure "anyone." Objectively speaking, though, if the pattern of lies, actions, and omissions set forth in the adversary complaint is proven, they were substantially certain to cause real injury to the receivership estate and the hundreds of persons who trusted Seawright with their investment. *E.g.*, *Shcolnik*, 670 F.3d at 630 ("Shcolnik's behavior resulted in willful and malicious injury if his claims of ownership were made in bad faith as a pretense to extract money from the Appellants."). This ground too is not suitable for dismissal at this early stage.

### C. *In Pari Delicto*

Lastly, Seawright contends that the doctrine of *in pari delicto* and Mississippi's "wrongful conduct rule" bar this suit.

"The phrase 'in pari delicto' is Latin for 'in equal fault.' The doctrine of in pari delicto refers to the principle that a plaintiff who has participated in a wrongdoing may not recover damages resulting from the wrongdoing." *Latham v. Johnson*, 262 So. 3d 569, 581 (Miss. Ct. App. 2018) (quotation marks, citation, and brackets omitted). "The doctrine . . . is undergirded by the concerns, first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." *Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 965 (5th Cir. 2012) (citation omitted). "*In pari delicto* is an equitable, affirmative defense, which is controlled by state common law." *Id.* (citations omitted).

The defects with Seawright's argument were well-explained by the *Jones* court. The Fifth Circuit started by reciting that "[a] receiver is the representative and protector of the interests of all persons, including creditors, shareholders and others, in the property of the receivership." *Id.* at 966. It then explained,

> Although a receiver generally has no greater powers than the corporation had as of the date of the receivership, it is well established that when the receiver acts to protect innocent creditors he can maintain and defend actions done in fraud of creditors even though the corporation would not be permitted to do so. The receiver thus acts on behalf of the corporation as a whole, an entity separate from its individual bad actors.

*Id.* (quotation marks, citations, and ellipses omitted). The Jones court declined to apply the *in pari delicto* doctrine.

Under this precedent, the receiver and the receivership estate are legally distinct from Adams and Madison Timber. Where, as here, the receiver is acting on behalf of innocent investor-victims, she "does not stand *in pari delicto* to [her bank], even if" Adams would. *Id.* And, as in *Jones*, "[a]pplication of *in pari delicto* would undermine one of the primary purposes of the receivership established in this case, and would thus be inconsistent with the purposes of the doctrine." *Id.* (citation omitted).

Mississippi's wrongful conduct rule is also unavailing. The rule provides that "no court will lend its aid to a party who grounds his action upon an immoral or illegal act." *Price v. Purdue Pharma Co.*, 920 So. 2d 479, 484 (Miss. 2006) (citation omitted). The Mississippi Supreme Court long ago explained that the judicial system, "from a consideration of its own pecuniary interests, and of the interests of other litigants, may wisely refuse to assist in adjusting equities between persons who have been engaged in an unlawful action." *W. Union Tel. Co. v. McLaurin*, 66 So. 739, 740 (Miss. 1914).

There are no inequities here in permitting the receiver to proceed. Just as with the doctrine of *in pari delicto*, the receivership estate is not limited by the wrongful conduct of Adams and Madison Timber. "The appointment of the receiver removed the wrongdoer from the scene." *Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir. 1995). And the equities favor permitting investor-victims to recover from a receiver's suit against those culpable in the Ponzi scheme.

For these reasons, Seawright's equitable arguments for dismissal are denied, without prejudice to their re-urging at the summary judgment stage.

**IV.    Conclusion**

The motion to dismiss is denied. Within 10 days, the parties shall contact the chambers of the Magistrate Judge to schedule a Case Management Conference.

**SO ORDERED**, this the 1st day of March, 2021.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE

13